**Opinion issued August 1, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-23-00078-CV**
_____

**IN THE INTEREST OF D.D.D., A CHILD**

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-04085-J**

---

## MEMORANDUM OPINION

The Texas Department of Family and Protective Services ("DFPS" or "the Department") sought termination of the parental rights of appellant R.L.H.J. ("Mother") to her minor son, D.D.D. ("David").[1] After a bench trial, the trial court

---

[1] In this opinion, we use pseudonyms for the minor child, his parents, his extended family members, and his foster father to protect their privacy.

found that there was clear and convincing evidence to support four statutory predicate grounds for termination. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (P). The court also found that there was clear and convincing evidence that terminating Mother's parental rights was in David's best interest. The court signed a judgment terminating Mother's parental rights to David.

In six issues on appeal, Mother argues that (1) legally and factually insufficient evidence exists to support termination under subsection (D); (2) factually insufficient evidence exists to support termination under subsection (E); (3)–(4) legally and factually insufficient evidence exists to support termination under subsections (O) and (P); (5) factually insufficient evidence exists to support the finding that termination was in David's best interest; and (6) the trial court abused its discretion by failing to name Mother as David's possessory conservator. We affirm.

## Background

David was born in 2016. In November 2019, when he was three years old, Mother and David both ingested PCP. David became unresponsive and was taken to the hospital. While at the hospital, Mother began displaying similar symptoms, and she was also admitted. Both Mother and David were in critical condition. At one point, David went into cardiac arrest and had to be resuscitated. Both Mother and

David tested positive for PCP at the hospital. Mother's and David's medical records from this incident were admitted into evidence at trial.

While Mother and David were still in the hospital, the Department initiated the underlying proceeding. The Department requested David's removal from Mother's care, and it sought temporary managing conservatorship. In the alternative, the Department sought termination of Mother's and Father's parental rights. This petition was accompanied by an affidavit from a Department caseworker that detailed how Mother and David arrived at the hospital and the testing and treatments that occurred at the hospital. This affidavit was not admitted into evidence at any of the trial settings in this case. Following an adversary hearing, the trial court granted the Department temporary managing conservatorship over David.

The Department prepared service plans for both Mother and Father. Mother's service plan required her to maintain stable housing and employment and to provide proof of housing and employment through lease agreements and check stubs. The plan required Mother to complete parenting classes, a psychological evaluation, a psychiatric evaluation, individual therapy, and domestic violence awareness classes. The plan ordered Mother to follow all recommendations made by treatment providers and specifically required her to "take medication as prescribed." With respect to substance use, the service plan required Mother to complete a drug and alcohol assessment and "contribute accurate, honest information for the

3

assessment." Mother was also required to submit to random drug testing, including urinalysis and hair follicle testing, upon request of the Department. The plan informed Mother that failure to submit to requested testing "will be considered a positive drug test." The trial court approved the service plan and made it an order of the court.

The trial court heard testimony in this case over four days in May 2021, October 2021, April 2022, and September 2022. When trial began in May 2021, the only service Mother had fully completed was parenting classes. Mother completed a substance abuse assessment and was required to do both individual and group substance abuse counseling. However, she "was not compliant for a period of over two to three months," and she was "subsequently discharged." By the time trial started, Mother had not successfully completed a substance abuse program, although she had completed "substance abuse individual counseling therapy" by October 2021.

Mother also had not completed domestic violence classes by the time trial had started. This concerned Department caseworkers because Father had reportedly been violent towards Mother in the past. Mother reported that in 2018, she had given birth to a premature baby that passed away "because of the domestic violence from [Father]." In April 2019, Father was charged with assaulting Mother. Mother had reported that she and Father were no longer in a relationship, but when Department

caseworker Gabrielle Bernal made an unannounced visit to Mother's home in February 2021, Father was present.[2] At the time trial began, Mother was pregnant, and she reported that Father was the father of this child as well. Mother gave birth to this child, L.D. ("Logan"), in June 2021.[3] Bernal was concerned that the continuing nature of Mother's relationship with Father could create an unsafe environment for children.

Around the October 2021 trial setting, Mother asked Bernal whether she needed to complete anything on her service plan. Bernal told Mother that the Department was waiting for a recommendation from Mother's psychological assessment; there was an issue with Mother's compliance with psychiatric treatment and medication; and Mother had not provided Bernal with a doctor's note concerning whether she did not need to take medication while breastfeeding Logan. Mother had not seen her psychiatrist since March 2021, and she had not started taking her prescribed medications. Additionally, although Mother completed a psychiatric evaluation, she did not accurately report information concerning her drug usage. Mother reported only that she had used marijuana three years before the evaluation,

---

[2]    Bernal agreed with the Department's counsel that there was an ongoing criminal case "where there's a restraining order in which [Mother and Father are] not supposed to be together."

[3]    Mother's parental rights to Logan were not at issue in the underlying proceeding.

but the Department initiated these proceedings following Mother's usage of PCP and she tested positive for cocaine and PCP multiple times throughout the proceedings.

By the April 2022 trial setting, Mother had one outstanding service to complete: substance abuse counseling. Although Mother had previously completed substance abuse counseling, she received a new referral for additional counseling following positive drug tests in October and November 2021. Mother missed appointments and was "unsuccessfully discharged" from counseling with the new provider "due to lack of commitment or engagement." Mother testified that she had difficulty communicating with this service provider and she unsuccessfully tried to find substance abuse classes on her own.

The Department required Mother to report for weekly urinalysis testing, and she was required to submit a hair sample each month. The Department obtained temporary managing conservatorship of David in November 2019, and Mother "continued to test positive in her hair" for PCP, cocaine, and marijuana throughout 2020. In February 2021, Mother's hair sample tested positive for marijuana. In April 2021, Mother's last urinalysis prior to the beginning of trial was negative, but she did not submit a hair sample. This concerned the Department because Mother was pregnant and her most recent hair follicle at the time, submitted in March 2021, tested positive for cocaine. Mother's hair sample submitted in October 2021 tested positive for cocaine and PCP. Her hair sample submitted in November 2021 tested

6

positive for cocaine, cocaine metabolites, marijuana, and marijuana metabolites. Her urinalysis sample submitted in February 2022 tested positive for benzodiazepines. This was the last drug test that Mother completed.

Mother was not consistent in reporting for drug testing throughout the case. At the October 2021 trial setting, Bernal agreed that Mother had "missed a majority" of her requested drug tests, but "[s]he began testing more frequently in July [2021]." Mother also did not appear for drug testing in December 2021, January 2022, or March 2022. At the September 2022 trial setting, Mother testified that she had not received any requests for drug testing in several months. She disagreed that she had skipped any required drug testing in 2022.

Mother had multiple urinalysis and hair follicle tests that were negative. She tested negative for all substances when she gave birth to Logan in June 2021, and Logan also tested negative for all substances. In July 2021 and August 2021, both her urinalysis and hair sample were negative for all substances. Mother also tested negative on a urinalysis performed in November 2021.

The Department had concerns about the safety and stability of Mother's housing. She obtained housing in early 2021, and prior to that she "was between multiple people." Mother's lease was set to expire in November 2021, and she reported to Bernal that she wanted to find a different apartment. Mother never provided a lease agreement to Bernal. As of May 2021, Mother had not been

7

employed, and SSI disability was her source of income. By October 2021, Mother reported to Bernal that she had recently started working, although she had provided no check stubs or other documentation.

Mother had supervised visitation with David during the pendency of the case. Mother did well in the visits, and although she was occasionally "occupied by the phone," she was "never inappropriate" with David. Bernal also witnessed Mother interact with Logan, and Mother "appear[ed] appropriate" around Logan. Mother brought David clothes and toys, and Mother's mother brought food to the visits. Mother did sometimes have trouble "redirecting" David, but Bernal acknowledged that Mother improved in this regard over the course of the visits. David "kind of shut[] down" when Bernal picked him up to take him to visits with Mother, and sometimes he did not "want to leave where he's from to go to the visit," but he did "fairly well" during the visits themselves. Mother testified that David did well during the visits, but he did not do well after visits. Sometimes she had to reassure him about going with the caseworker after the visit, and she had to tell him that he and Logan would be together "very soon."

The Department placed David with Foster Father in November 2020. David had been diagnosed with Post Traumatic Stress Disorder and he "had some significant behavior issues," including "emotional disturbance" and ADHD, for which he needed medication. However, because David had previously suffered from

a drug overdose, he had to see a cardiologist and undergo several tests before he could be placed on medication. By the October 2021 trial setting, David no longer took any medication for heart problems. He continued to take a "low dosage" of Adderall for ADHD. Foster Father had been "very proactive" in setting up David's medical appointments and attending follow-up appointments to ensure that David's medication "is appropriate and continues to be recommended." Foster Father also ensured that David attended all necessary meetings for receiving educational services.

David had "acted out on other children" in the past and tended to throw things when upset. Because of David's behavioral issues, he "require[d] a very strict, structured environment" and "require[d] constant supervision." The Department believed that caring for David was "a lot different" than caring for a newborn child such as Logan. Under Foster Father's care, David had "progressed tremendously." His behavior had stabilized, he had become "very positive" and happy, and he was able to "actually talk and verbalize his emotions and feelings and moments when he's triggered." David had become a good student with "very minimal behavior reports." David had had no behavioral issues at school since at least December 2021. Bernal testified that David had "just drastically changed into a different child."

The Department considered several familial placements for David, including David's paternal grandfather, his maternal grandmother, and an aunt of Mother's

("Dierdre"). The Department did not approve placement with either the paternal grandfather or the maternal grandmother. In July 2021, the trial court ordered the Department to conduct a home study for Dierdre, and the study was completed later that month. By the October 2021 trial setting, when trial resumed, the home study had not yet been presented to the attorneys involved in the case because Bernal did not "have the final approval or denial at this time to provide." The Department had approved Dierdre's home study by the April 2022 trial setting, but the new caseworker, Angela Guerrero, did not wish to place David with Dierdre.

Dierdre obtained custody of Logan shortly after his birth in June 2021. The Department considered Dierdre's home to be a suitable placement for Logan, and Dierdre was meeting all of his needs. David, however, had "very special needs" and was "very bonded" with Foster Father. The Department believed that moving David from his placement with Foster Father would be "traumatic" because David had experienced "immense trauma" following his overdose and was "very well established" in his current placement. Mother was allowed to go to Dierdre's house for supervised visits with Logan, and she was present at Dierdre's house for around twelve hours per day, every day. Dierdre told Guerrero and Betsi Longoria, the Child Advocates coordinator assigned to the case, that she was willing to allow David to be around Mother. The Department had no concerns about Dierdre allowing Father to be present at her house.

Bernal acknowledged that Dierdre wanted David to be placed with her, Dierdre and David were biologically related, and placing David in Dierdre's house would allow him to live with his brother Logan. Guerrero also testified that Dierdre had told her that she wanted David to be placed with her. However, Guerrero also testified that Dierdre told her during a visit in January 2022 that she did not want David to be placed with her because she knew that Foster Father was meeting David's needs, David was bonded to Foster Father, and she had heard David "express sentiments" about Foster Father.[4] Dierdre told Guerrero that she just wanted David to "be able to know his family" and that she would be "comfortable with visits" with David. Dierdre's statements played a role in the Department's decision to keep David with Foster Father.

At the September 2022 trial setting, Dierdre testified that she did not believe that it was appropriate for David and Logan to be returned to Mother and she would like to raise both boys. She agreed that she would "be protective" of the boys and would not allow Mother to have them until an "appropriate" time. Dierdre denied ever saying that she did not want David placed in her home. She believed it would

---

[4]    Guerrero, Foster Father, and Longoria testified that Foster Father and Dierdre have met once. Guerrero and Longoria attempted to schedule more visits between the two, but Dierdre "stated she only wanted to have that one visit" and she "was cool with" David living with Foster Father. Longoria testified that she believes Dierdre does not want her family to know that she is comfortable with David's placement with Foster Father.

be in David's best interest to be placed with Logan and that separating them would be traumatic for both of them. She disagreed that removing David from his placement with Foster Father would be traumatic for him.

Dierdre and Logan attended visitations with David and Mother. David was "initially very timid and appeared uncomfortable" around Dierdre, but he had "warmed up a little bit" and considered her a familiar face. David was also shy around Logan at first, but he "like[d] seeing his sibling" and he interacted with Logan "before going on doing his own tasks." Guerrero agreed that David and Logan appeared to have bonded. Mother testified that David is "very observant" with Logan, he is a "good brother" to Logan, and the boys have fun at their visits. Mother believed it would be in both David's and Logan's best interest for Dierdre to have custody of both boys, and she believed that separating the two boys would negatively impact them.

At the time trial began in May 2021, David was five years old. David expressed to Bernal, Guerrero, Foster Father, and Longoria that he wanted to stay in his current placement with Foster Father. David talked to Bernal about "the home environment and the people he gets to see and the fun they have together," and he referred to Foster Father as his father. Bernal had no doubts that Foster Father would support David financially, medically, and emotionally. She had no concerns about drug use in Foster Father's home. Foster Father testified that he has "great

12

communications" with Dierdre and that, if allowed to adopt David, he would work to maintain David's relationship with Logan.

Following trial, the trial court signed an order terminating both Mother's and Father's parental rights to David.[5] The court found, by clear and convincing evidence, that Mother had violated Family Code subsections 161.001(b)(1)(D), (E), (O), and (P). The court also found that termination of Mother's parental rights was in David's best interest. The court appointed the Department as David's sole managing conservator. This appeal followed.

## Sufficiency of the Evidence

In her first four issues, Mother challenges the sufficiency of the evidence to support the statutory predicate grounds for termination found by the trial court. She challenges the legal and factual sufficiency of the evidence supporting the trial court's findings under subsections 161.001(b)(1)(D), (O), and (P). She challenges the factual sufficiency of the evidence supporting the finding under subsection 161.001(b)(1)(E). In her fifth issue, Mother challenges the factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in David's best interest.

---

[5] Father did not appeal the termination of his parental rights.

## A. *Standard of Review*

A parent's right to the "companionship, care, custody, and management" of her child is an interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quotations omitted); *see Troxel v. Granville*, 530 U.S. 57, 65 (2000) (stating that this interest "is perhaps the oldest of the fundamental liberty interests recognized by" United States Supreme Court). We strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). However, although parental rights are "of constitutional magnitude," they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). It is "essential" that courts do not sacrifice the child's emotional and physical interests merely to preserve the parent's rights. *Id.*

Family Code section 161.001 balances the competing interests of the parent and the child by permitting termination of parental rights only if the party seeking termination establishes both that (1) the parent's acts or omissions satisfy at least one statutory predicate ground for termination; and (2) termination is in the child's best interest. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see* TEX. FAM. CODE § 161.001(b). Both the Family Code and the Due Process Clause of the United States Constitution require proof by clear and convincing evidence in termination of parental rights cases. *In re E.N.C.*, 384 S.W.3d at 802; *see* TEX. FAM. CODE § 161.001(b); *Santosky*, 455 U.S. at 769 (stating that clear and convincing standard

14

of proof "adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process"). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

Because the standard of proof at trial is clear and convincing evidence, on appeal we apply a heightened standard of review when examining the sufficiency of the evidence. *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022); *In re A.C.*, 560 S.W.3d at 630. In reviewing a legal sufficiency challenge, we must determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding under review was true. *In re J.W.*, 645 S.W.3d at 741 (quotations omitted). Even under this heightened standard, we must grant deference to the factfinder, "who heard the witnesses and evaluated their credibility." *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021). We view the evidence in the light most favorable to the finding. *In re J.W.*, 645 S.W.3d at 741. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* We may not, however, disregard undisputed facts that do not support

15

the finding. *Id.*; *In re A.C.*, 560 S.W.3d at 630–31. The factfinder remains the "sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d at 312.

In reviewing a factual sufficiency challenge, we must consider the entire record—including evidence both supporting and contradicting the finding—and determine whether the factfinder could have reasonably formed a firm belief or conviction that the finding was true. *In re C.H.*, 89 S.W.3d at 25–26; *see In re A.C.*, 560 S.W.3d at 631 (stating that factual sufficiency review "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding"). If the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the finding was true, the evidence is factually insufficient. *In re A.C.*, 560 S.W.3d at 631; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

To affirm a termination judgment on appeal, we need uphold only one predicate ground—in addition to upholding a challenged best interest finding—even if the trial court based termination on more than one predicate ground. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, termination of parental rights under subsections (D) and (E) can serve as the basis for termination of a parent's rights to another child in the future. *See* TEX. FAM. CODE § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d at 234. As

a result, due process requires review of a trial court's findings under subsections (D) and (E) "even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child." *In re N.G.*, 577 S.W.3d at 235.

## B. *Statutory Predicate Grounds for Termination*

### 1. Termination under Subsections (D) and (E)

The trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE § 161.001(b)(1)(D). The trial court may also terminate the parent-child relationship if it finds by clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *Id.* § 161.001(b)(1)(E). Because both of these subsections concern endangerment and the evidence relevant to each subsection may overlap, we discuss these predicate findings together.

"Endanger" means to expose a child to loss or injury or to jeopardize the child's emotional or physical well-being. *In re J.W.*, 645 S.W.3d at 748. This means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Id.* (quotations omitted).

17

Endangerment under subsection (D) "may be established by evidence relating to the child's environment." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Environment" refers to the acceptability of the child's living conditions, as well as the parent's conduct in the home. *In re V.A.*, 598 S.W.3d 317, 328 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); *In re S.R.*, 452 S.W.3d at 360. Inappropriate, abusive, or unlawful conduct by a parent or another person who lives in the child's home can create an environment that endangers the child's physical and emotional well-being. *In re S.R.*, 452 S.W.3d at 360. Parental drug use also supports the conclusion that the child's surroundings endanger his or her physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *In re V.A.*, 598 S.W.3d at 328; *In re S.R.*, 452 S.W.3d at 360. A court may terminate parental rights under this subsection based on a single act or omission. *In re V.A.*, 598 S.W.3d at 329; *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

The relevant time period for evaluating subsection (D) is before the child's removal from the parent because conditions or surroundings cannot endanger a child if the child is not exposed to them. *In re J.W.*, 645 S.W.3d at 749 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)); *In re S.R.*,

18

452 S.W.3d at 360. The suitability of a child's living conditions and the conduct of the parent and others in the home are relevant to this inquiry. *In re J.W.*, 645 S.W.3d at 749. Evidence that a parent will knowingly expose the child to a dangerous environment in the future is not proof that the parent has knowingly exposed the child to a dangerous environment in the past, which is the focus under subsection (D). *Id.*

Under subsection (E), the Department must show that "the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act." *In re S.R.*, 452 S.W.3d at 360. This subsection requires more than a single act or omission to support termination; instead, the statute requires "a voluntary, deliberate, and conscious course of conduct by the parent." *Id.*; *In re J.T.G.*, 121 S.W.3d at 125. Unlike under subsection (D), in evaluating the sufficiency of the evidence under subsection (E), we may consider conduct both before and after the Department removed the child from the home. *In re S.R.*, 452 S.W.3d at 360.

It is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *In re J.W.*, 645 S.W.3d at 748. "The specific danger to the child's well-being may be inferred from parental misconduct standing alone." *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *In re S.R.*, 452 S.W.3d at 360. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

*In re M.D.M.*, 579 S.W.3d at 765. A parent's past endangering conduct may create an inference that the conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Drug use and its effects on the parent's life and ability to parent may establish an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Illegal drug use creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting."). Abusive and violent conduct by a parent in a family relationship may also endanger a child's well-being. *In re A.A.M.*, 464 S.W.3d at 426; *In re S.C.F.*, 522 S.W.3d 693, 700 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("Domestic violence may be considered as evidence of endangerment.").

In arguing that legally and factually insufficient evidence supports the trial court's finding under subsection (D), Mother contends that the record contains no evidence of David's environment before the Department removed him from Mother in November 2019. Mother acknowledges that David "somehow ingested a controlled substance at some point on November 9," but she argues that that fact, standing alone, cannot support a finding by clear and convincing evidence that she knowingly placed or knowingly allowed David to remain in conditions or surroundings which endangered his physical or emotional well-being. We disagree.

While Mother is correct that the record contains no evidence concerning the physical condition of the home at the time of David's removal from her custody, in a subsection (D) analysis we may also consider the conduct of a parent in the home, as a parent's conduct can create an endangering environment for a child. *In re V.A.*, 598 S.W.3d at 328; *In re S.R.*, 452 S.W.3d at 360; *see In re J.W.*, 645 S.W.3d at 749 ("The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry."). Specifically, a parent's drug use supports the conclusion that the child's surroundings endanger their physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d at 125.

At trial, Mother agreed that both she and David ingested PCP in November 2019, leading to their hospitalization. She acknowledged that they both tested positive for PCP ingestion and that this led to serious health consequences for three-year-old David, who went into cardiac arrest and had to be resuscitated at the hospital. Mother agreed with the Department's counsel that "doing illegal drugs while a two-year-old [sic] is around is extremely dangerous."

None of the testimony at trial detailed how David ingested PCP. However, David's medical records, which were admitted into evidence, contain some information on the events leading to David's admittance to the hospital. A "clinical note" completed by a doctor on November 11, 2019, stated:

> [David] is a 3 year old male who was brought to Children's Memorial
> Hermann Hospital with acute onset of altered mental status. The history

21

is obtained from chart review and discussion with [David's] maternal grandmother (MGM) who is at bedside.

[David] lives with his mother, maternal grandmother (MGM), grandmother's husband, maternal uncle, and his older cousin. On Friday evening 11/08, [David] stayed the night at his paternal grandmother's apartment. MGM says mother spent the next day on Saturday 11/09 at paternal grandmother's apartment complex. MGM says mother also has a friend who lives in the apartment complex, and she believes she took [David] with her to the friend's apartment. Mother brought [David] home at approximately 7:15 PM on Saturday night 11/09. MGM says [David] was talkative and acting normally. At approximately 8 PM, MGM put [David] in the bedroom with his mother, so MGM and her husband could go buy tacos for the family for dinner. The bedroom is a single room without an adjacent bathroom. MGM says after approximately 20 minutes, they were on the way home from the taco stand, and mother called her to tell her that [David] was unresponsive and not waking up. [David's] 13-year old cousin was also in the house at the time, and he called EMS. MGM says they hurried home, and when they arrived, EMS was at the home. EMS reported [David] was unresponsive to painful stimuli and drooling. They placed him on supplemental oxygen via nonrebreather mask and transported him to Children's Memorial Hermann Hospital.

MGM and mother also arrived at CMHH Emergency Department. Mother was described as anxious from presentation, and while providing history to the physicians, she developed altered mental status and vomited. She became unresponsive and was transferred to main ED for medical care, which included intubation to protect her airway.

A clinical note in Mother's medical records stated that David's maternal grandmother reported that prior to hospitalization, "the patient and his mother had recently returned from an outing with a friend," Mother's "demeanor was stable and appropriate," and David "was left in the care of [Mother] while [maternal grandmother] left to obtain food."

The trial court had evidence before it that David, a three-year-old child, somehow ingested PCP while in Mother's care. He was rushed to the hospital and, while at the hospital, went into cardiac arrest and had to be resuscitated. That same evening, Mother also ingested PCP and became ill enough to require hospitalization. It is undisputed that both Mother and David tested positive for PCP at the hospital. A finding under subsection (D) may be based on a single act or omission. *See In re V.A.*, 598 S.W.3d at 329. The evidence in the record demonstrates that Mother allowed David to be in an environment in which he could—and did—ingest a dangerous drug. *See Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (noting that while subsection (D) inquiry "focuses on the evidence of the child's physical environment," environment "produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being").

We conclude that, when viewing the evidence in the light most favorable to the finding, the trial court could have reasonably formed a firm belief or conviction that Mother knowingly placed or knowingly allowed David to remain in conditions or surroundings which endangered his physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.W.*, 645 S.W.3d at 748–49; *In re J.T.G.*, 121 S.W.3d at 125. We further conclude that, when considering the entire record, the trial court still could have reasonably formed a firm belief or conviction that Mother

23

knowingly placed David in an endangering environment in violation of subsection (D). We therefore hold that legally and factually sufficient evidence supports the trial court's predicate finding under subsection (D).

Turning to subsection (E), Mother acknowledges that she and David tested positive for PCP at the hospital in November 2019, but she argues that there is no evidence in the record of how David ingested the PCP and there is no evidence that she had "engaged in this type of behavior prior to that one incident." Mother argues that, therefore, there is no evidence that she engaged in an endangering course of conduct. Mother also acknowledges that a parent's continuing drug use can qualify as a voluntary course of conduct that endangers a child, but she argues that the record contains no evidence that, following David's removal, Mother's continued drug use endangered David or Logan, who tested negative for drugs when he was born in June 2021, during the pendency of this case. Mother further acknowledges that Father had been violent with her in the past, but she argues that there is no evidence in the record that she had any contact with Father. Mother argues that the evidence is factually insufficient to support the trial court's predicate finding under subsection (E).

Texas courts have repeatedly held that drug use and its effects on the parent's life and ability to parent may establish an endangering course of conduct under subsection (E). *See, e.g.*, *In re J.O.A.*, 283 S.W.3d at 345; *In re A.A.M.*, 464 S.W.3d at 426. Illegal drug use "exposes the child to the possibility that the parent may be

24

impaired or imprisoned." *In re S.C.F.*, 522 S.W.3d at 700; *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (quotations omitted). Drug activity "significantly harms the parenting relationship" and can constitute endangerment even if it occurs outside of the child's presence. *In re A.M.*, 495 S.W.3d at 579. "In addition, a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *Id.* at 580 (quotations omitted). A factfinder can infer that a parent's failure to submit to court-ordered drug testing indicates that the parent was avoiding testing because they were using drugs. *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

As discussed above, the Department removed David from Mother's care after an incident in which Mother and David ingested PCP and had to be hospitalized. Although this was the only instance in which David ingested drugs, Mother repeatedly tested positive for drugs—including PCP, cocaine, and marijuana—throughout the pendency of the proceeding. Mother tested positive for all three drugs throughout 2020 and early 2021. Around the time of Logan's birth in June 2021, Mother tested negative for all substances for a couple of months, and Logan did not have drugs in his system when he was born. However, testing of Mother's hair samples collected in October 2021 and November 2021—several months after

25

Logan's birth—yielded positive results for both cocaine and marijuana. Mother testified that she had to stop breastfeeding Logan after these positive drug test results. In February 2022, Mother tested positive for benzodiazepines.

Mother cites the Fourteenth Court of Appeals' decision in *In re L.C.L.*, 599 S.W.3d 79, 84–86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc), for the proposition that a parent's drug use standing alone, without evidence of how that behavior endangers a child, cannot support termination under subsection (E). She points out that she had visitation with David throughout the pendency of the case and she always behaved appropriately with him during the visits, even though she also had positive drug tests. She also argues that there was no evidence that her drug use during this case negatively affected Logan.

In *In re L.C.L.*, the Department received a referral of neglectful supervision of the mother's three children, including allegations that the children were often left home alone in a house with no electricity. *Id.* at 82–83. A caseworker visited the house, observed that the children appeared clean and healthy, noted that the house had working utilities and was free from safety hazards, and learned that the children were not left at home for days at a time. *Id.* at 83. The caseworker asked the mother to take a drug test, and the hair follicle test yielded a positive result for marijuana and cocaine. *Id.* Following trial, "[t]he sole basis for termination of [the mother's] rights was that she tested positive for drugs both initially and throughout the

26

proceedings." *Id.* at 84. No evidence at trial, however, connected the mother's positive drug test results to "any activity that endangered her children." *Id.* The Fourteenth Court stated that "[a] plain language reading of the statute requires a causal connection between [the mother's] drug use and the alleged endangerment." *Id.*

We first note that this Court has not adopted the Fourteenth Court's rationale in *In re L.C.L.* Furthermore, this case is factually distinguishable because here there was evidence that Mother's drug usage did endanger David: Mother and David both ingested PCP in November 2019, and this incident led to their hospitalizations and three-year-old David's near death from cardiac arrest. Following David's removal from Mother's care and the initiation of this termination proceeding, Mother continued to test positive for PCP, cocaine, and marijuana. Mother's illegal drug use before David's removal and during the pendency of this case supports a conclusion that Mother engaged in conduct that endangered David's physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 345; *In re A.A.M.*, 464 S.W.3d at 426.

In addition, the record reflected that Mother continued to see Father even though he had engaged in domestic violence against her. Mother testified that Father assaulted her in 2018 when she was pregnant. This child was born prematurely and passed away. Mother reported to Bernal that the child passed away "because of the domestic violence from the father." In April 2019, prior to David being removed

27

from Mother's care, Father was arrested and charged with assaulting Mother. Although Father was ordered not to contact Mother, Father and Mother continued to see each other. In February 2021, Bernal visited Mother's home and Father was present. Mother characterized her relationship with Father as "on and off," and she acknowledged that Logan, born during the pendency of this case, was Father's child. This Court has held that a parent's "continued association with a known abuser is a conscious choice that endangers a child's physical and emotional wellbeing because it exposes the child to the possibility of violence." *In re J.T.*, No. 01-19-00908-CV, 2020 WL 1942463, at *9 (Tex. App.—Houston [1st Dist.] Apr. 23, 2020, pet. denied) (mem. op.); *see In re N.E.*, No. 01-22-00739-CV, 2023 WL 2530197, at *9 (Tex. App.—Houston [1st Dist.] Mar. 16, 2023, pet. denied) (mem. op.) (considering, in conducting subsection (E) analysis, fact that mother remained in contact with father despite his history of domestic violence towards her).

When viewing the entire record in this case, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Mother engaged in conduct that endangered David's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E). We hold that factually sufficient evidence supports the trial court's finding under subsection (E).

28

We overrule Mother's first and second issues.[6]

## C.   *Best Interest Finding*

In addition to a statutory predicate ground for termination, the trial court must also find by clear and convincing evidence that termination is in the child's best interest. *Id.* § 161.001(b)(2). There is a strong presumption "that the best interest of a child is served by keeping the child with a parent," *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam), but there is also a presumption that "the prompt and permanent placement of the child in a safe environment" is in the child's best interest. TEX. FAM. CODE § 263.307(a). The best-interest inquiry is "child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d at 631.

In reviewing the trial court's best-interest finding, we consider several non-exclusive factors including: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) whether programs are available to assist those individuals; (6) the plans for the child by those individuals; (7) the stability of the proposed placement; (8) the

---

[6]   Because we conclude that legally and factually sufficient evidence supported two statutory predicate grounds for termination—subsections (D) and (E)—we need not address Mother's third and fourth issues: whether legally and factually sufficient evidence supports the other two predicate grounds found by the trial court, subsections (O) and (P). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)).

The court need not have evidence on every element to make a valid finding on best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *In re J.G.S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) ("The absence of evidence about some of the factors would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest."). But a lack of evidence "does not constitute clear and convincing evidence." *In re E.N.C.*, 384 S.W.3d at 808.

No one factor is controlling, but in a particular situation, analysis of a single factor may be adequate to support a finding that termination is in the best interest of the child. *In re J.M.T.*, 519 S.W.3d at 268; *see In re J.D.G.*, 570 S.W.3d at 853 ("In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the child's best interest; in other cases, there could be more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice to support termination.") (quotations omitted). Proof of acts or omissions relevant to a predicate ground for termination does not relieve the Department of proving that termination is in the child's best interest, but the same evidence may be probative of both elements. *In re A.C.*, 560

S.W.3d at 631–32. We may consider circumstantial evidence, subjective factors, "and the totality of the evidence as well as the direct evidence." *In re J.D.G.*, 570 S.W.3d at 854 (quotations omitted).

In arguing that factually insufficient evidence supports the trial court's best interest finding, Mother emphasizes that she is not seeking managing conservatorship of David. Instead, she wants David to live with Dierdre and Logan.

## 1. David's Desires

David was five years old when trial began and six years old when it concluded. He did not testify at any of the trial settings. David enjoyed visiting with Logan, had positive interactions with Dierdre, and did "fairly well" when visiting with Mother. Mother testified that sometimes David gets "a hesitation" at the end of visits when he must leave with the caseworker, and either Mother or Dierdre had to "let him know he's going to be okay" and let him know that he was "going to be with [Logan] very soon." Mother also testified that David "keeps asking us when this is going to be over." She believed that David wished "to live under the same roof with his brother."

However, Bernal, Guerrero, Longoria, and Foster Father all testified that throughout the course of the proceedings, David had expressed on multiple occasions that he wanted to stay in the placement with Foster Father. Bernal testified that David enjoyed telling her about the home life and fun he has with Foster Father,

whom he referred to as his father. David was "very attached" to Foster Father's parents and siblings, he considered Foster Father's dogs to be "his brothers," and he considered Foster Father's neighbors to be his close friends.

### 2. David's Emotional and Physical Needs

Following his hospitalization in 2019, David was diagnosed with PTSD. He was also diagnosed with "emotional disturbance" and ADHD, and he had "significant behavior issues" after being removed from Mother's care. David needed medication to treat these issues, but due to his prior drug overdose, his cardiologist had to approve any medications. By the October 2021 trial setting, David no longer needed to take any heart medications, although he still needed a "low dosage of Adderall" for ADHD. Foster Father had been "very proactive" in attending to David's medical and psychological care and in ensuring that David's educational needs were met. By the last trial setting in September 2022, David had been discharged from seeing a cardiologist, behavioral specialist, and therapist.

Bernal testified that David had behavioral issues both inside and outside of the school setting. He had conflict with both peers and teachers, and he had "acted out on other children." Both Bernal and Foster Father testified that early in his education, David tended to throw things when upset, and he had "flipped tables, flipped chairs, [and] would destroy the toys." David's teachers would sometimes need to "take the entire classroom out" and call Foster Father to "talk to him and

32

bring him down."[7] Foster Father testified that when David was first placed in his home, he was "very hyper, running around, unable to really keep his attention on lots of things at one time." David was also "very shy [and] unable to communicate his feelings." Bernal and Guerrero agreed with the Department's counsel that David "require[d] a very strict, structured environment," a "very calm" environment, and "constant supervision."

Bernal, Guerrero, Longoria, and Foster Father all testified that David's behavioral issues had improved significantly since he had been placed with Foster Father. Bernal characterized David's progress as "tremendous" and testified that David's behavior had stabilized, he was "very positive," and he was able to verbalize his emotions and feelings when he experiences something that triggers him. David was doing "very well in school" and had had "minimal behavior reports" since early 2021. Guerrero agreed that David had not had a behavioral issue at school since she was assigned to the case in December 2021. She also testified that Foster Father had met all David's needs since the beginning of the placement and that David had "excelled and improved with his behaviors and in the school setting." Longoria testified that "the consistency, nurturing, following up with services is extremely important," and Foster Father had "been able to really work closely with the school

---

[7] Foster Father agreed that he had a "pretty flexible" schedule because he "work[ed] on [his] own time."

to help [David] settle down in school to where he is now." As of the last trial setting in September 2022, David's services were "all academic based" and not "behavioral based."

Foster Father testified that he had not received a call from David's school concerning his behavior "at all this entire year, including last school year." His teachers "love him," and David "interacts with the students like a normal first grader student." David was "on grade level and above grade level on certain academic issues." Foster Father attributed the change in David's behavior to being "very persistent with consistency." Foster Father testified:

> We have a schedule; I'm very strict on that schedule. We go and do lots of different things to interact. We increased our social skills with other children around his age. Having a stable environment at home, I believe has helped in the sense that he sees me on a daily basis, it's a very routine schedule, and schedules help him get comfortable.
>
> When things are kind of taken out of array, he kind of can get very excited sometimes, so having a schedule is very important, and we've just worked on communication.

The caseworkers, Longoria, and Foster Father all testified that David had made substantial progress behaviorally since being placed in Foster Father's care, and the consistency of his schedule with Foster Father played a large role in that change. David was the only child living in Foster Father's home.

### 3.    Emotional and Physical Danger Now and In the Future

The Department did not believe that David's placement with Mother was appropriate given the circumstances under which he was removed from Mother's home, Mother's ongoing drug use, and the continuing nature of her relationship with Father, who had been violent towards her in the past. Although the Department did not express any concerns that Dierdre would use drugs or be violent around David, and indeed a Department supervisor had approved a home study for Dierdre, Guerrero and Longoria were concerned that David would still see Mother if he were placed with Dierdre. Guerrero testified that Dierdre had told her that "she is willing to allow [David] to be around his mother." Longoria testified that she believed David "would continue to have exposure to his mother for sure" because Dierdre "believes that that's [David's] mother, and she believes that relationship is important," and Dierdre "feels that [David] should be able to have more exposure to his mother." Longoria was also concerned that David might encounter Father if placed with Dierdre because Dierdre once took Logan to see Father "after he was born and placed in her home."

All witnesses testified concerning the potential emotional effect on David if he were removed from Foster Father's house and placed with Dierdre. Mother wanted David to be placed with Dierdre, stating that she believed it was important that David be in a house with Logan and that it would be in the best interest of both

35

boys for them to live together. She noted that Dierdre, as her aunt, was also biologically related to both David and Logan. Mother agreed with her counsel that it would be "emotionally traumatizing" for David to be separated from Logan. Mother did not believe that David was bonded to Foster Father. When asked if it would surprise her to learn that David had expressed his desire to stay with Foster Father, Mother stated that David "tells [her] something totally different." She did not believe that David would be negatively impacted if removed from Foster Father's care, and she did not believe Foster Father was meeting all David's needs.

Dierdre requested that David be placed in her home with Logan. When asked whether she would allow Mother to have custody of the boys, Dierdre agreed that it was not appropriate for Mother to have custody and she stated that she would "be protective" of the boys. Dierdre believed that it was in David's best interest to be placed with Logan, and she further believed that it would be traumatic for them to be separated. She did not believe that it would be traumatic to remove David from Foster Father.

Guerrero acknowledged that a Department supervisor had approved a home study for Dierdre and that Dierdre had custody of Logan with no issues. When asked why the Department was unwilling to place David with Dierdre, Guerrero testified that David had PTSD and his needs were very different from Logan's. He had

"experienced immense trauma," he was "very well established" with Foster Father,[8] and moving him from Foster Father would be traumatic. Guerrero also testified that Dierdre had at one point told her that she did not want David to be placed with her because she knew Foster Father was meeting David's needs. Dierdre told Guerrero that "she knew [David] was very bonded to his foster parent because she's heard [David] express sentiments about his foster dad in the visits." Guerrero stated that she considered the potential emotional effect of being separated from Logan, but she still believed it was in David's best interest to remain with Foster Father.

Longoria also believed that it was in David's best interest to remain in his current placement with Foster Father. She testified that David was "extremely traumatized" when he was first removed from Mother's care, and he had made substantial progress with Foster Father. She stated, "It would not be in his best interest to uproot him and have him start all over again because he made so much progress." Shortly after meeting Foster Father, Dierdre expressed to Longoria that

---

[8]   Mother points out that David had been placed with Foster Father since November 2020, and the Department did not conduct a home study for Dierdre until July 2021. By the October 2021 trial setting, the Department was still reviewing that home study. By the next trial setting in April 2022, Guerrero testified that the Department did not wish to place David with Dierdre, in part because he was so well bonded with Foster Father. We note that it appears from Mother's testimony that Dierdre was not a potential placement option for David until after Logan's birth in June 2021, when Mother got in touch with her father's side of the family and Dierdre took custody of Logan. We, however, express concern with the significant delay of months between days of testimony in this trial, which took over a year to conclude.

she was comfortable with David remaining with Foster Father and she believed that continuing that placement was in David's best interest.

Foster Father testified that David is bonded to him. He believed it would be "extremely" detrimental to David if he were removed, noting that David considers Foster Father to be his "dad" and Foster Father's parents to be his grandparents. David has also formed relationships with his classmates, as well as with Foster Father's siblings and neighbors. Removing David from Foster Father would remove David from the lives of "a lot of other people." Foster Father has seven siblings and "believe[s] in keeping a very tight-knit family group," and he intended to help facilitate David's relationship with Logan throughout their childhoods. He testified that he has had "great communications" with Dierdre, and he had "no intention of keeping the boys apart."

### 4. Plans for David by Individuals Seeking Custody[9]

Both Foster Father and Dierdre testified that they were interested in seeking custody of David. Foster Father intended to adopt David if the trial court terminated

---

[9] The Texas Supreme Court has held that evidence concerning placement plans and adoption is relevant to best interest but is not a dispositive factor. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). The inquiry is whether, based on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest "even if the agency is unable to identify with precision the child's future home environment." *Id.*; *In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.) (holding sufficient evidence existed that termination was in child's best interest when both foster family and biological aunt were interested in adopting child). Similarly, this Court has held that the

Mother's and Father's parental rights. He stated that his plans for David were "[t]o see him grow and become the best person he can be." Foster Father intended "to support him all the way through that."

The trial court heard conflicting evidence concerning Dierdre's desires in having David placed with her. At the September 2022 trial setting, she requested that the trial court place David with her. She denied that she ever stated to anyone that she did not want David placed in her home or that she stated that she did not want to remove David from his placement with Foster Father. She agreed that she wanted David and Logan "to be together for the rest of their life."

Guerrero and Longoria testified that while Dierdre might be stating at trial that she wanted David placed with her, she had previously stated otherwise to both of them. Guerrero testified that in early 2022, Dierdre told her that she did not wish for David to be placed with her. Guerrero testified:

> She stated that she knows the current foster parent is able to meet [David's] needs. She also stated that she knew [David] was very bonded to his foster parent because she's heard [David] express sentiments about his foster dad in the visits. She also stated that she just wanted [David] to be able to know his family and she would be comfortable with visits with [David]. She also stated even if she were to get custody of [David], she wouldn't remove him from the foster parent.

---

determination of where the child will be placed is a factor in evaluating best interest, but it is not a bar to termination that placement plans are not final or that placement will be with non-relatives. *Rogers v. Dep't of Fam. & Protective Servs.*, 175 S.W.3d 370, 379 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.); *see In re L.M.*, 572 S.W.3d 823, 837 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Guerrero agreed that Dierdre had "gone back and forth multiple times" about whether she wanted David to be placed with her. Guerrero further agreed that it was in David's best interest "to remain in a home where they are for sure wanting to keep him 100 percent."

Longoria also testified that while Dierdre was currently requesting placement of David, that had not always been her position. After Dierdre and Foster Father met, Dierdre told Longoria that she had wanted to meet Foster Father for herself. Dierdre believed that David was old enough to express his feelings, and she knew that David considered Foster Father his father. Dierdre "said she was cool with that relationship with [David] remaining with the foster dad and she felt comfortable that they would be able to continue a relationship." Dierdre expressed to Longoria at that time that she believed it was in David's best interest to remain with Foster Father, she did not want to break the bond they had developed, and she did not want to remove David from Foster Father's home. Longoria believed that Dierdre's change of position was because she did "not want her family to know her true intent." Longoria testified, "I believe she is comfortable with where [David] is and she's good with that, but I believe she does not want her family to know." Longoria also testified that Dierdre "made a comment to [her] that [Dierdre] was not going to raise [Mother's] children." Longoria agreed that Dierdre had "gone back and forth" on whether she wanted

40

David placed with her and that "whether or not she would continue to care" for David was a concern.

### 5. Acts or Omissions by the Parent

As we have discussed when analyzing whether sufficient evidence supports the predicate findings, the trial court had undisputed evidence before it that David ingested PCP while in Mother's care. He was hospitalized and went into cardiac arrest while at the hospital. David had physically recovered by the time trial concluded, but he experienced intense trauma due to this incident. It is also undisputed that despite a brief period of sobriety around the time Logan was born in June 2021, Mother continued testing positive for drugs throughout the pendency of the case. Mother also had an "on and off" relationship with Father, who had been violent towards her in the past and who faced a criminal charge for allegedly assaulting Mother. Mother agrees that, at this point, she is not an appropriate caregiver for David, and she is not seeking managing conservatorship of him.

The trial court heard conflicting evidence concerning the best placement for David. Mother and Dierdre both requested that David be placed with Dierdre, emphasizing the familial relationship between David and Dierdre, who also had custody of David's younger brother, Logan. Mother and Dierdre both believed it would be traumatic for David and Logan to be separated, it was in their best interest to live together, and it would not be detrimental to remove David from Foster Father.

41

Mother also argues that no evidence in the record indicates that Dierdre could not care for David, noting that no issues had arisen in Dierdre's care of Logan.

The Department, on the other hand, believed it was in David's best interest for him to remain with Foster Father, who wished to adopt him. Although the Department had no concerns with Dierdre having custody of Logan, a child who had never had any special needs, David's circumstances were different. David had been in Foster Father's house since November 2020, and Foster Father had been diligent in attending to David's physical, emotional, psychological, and educational needs. Due in large part to Foster Father's insistence on a consistent schedule, David had made "tremendous" progress behaviorally, emotionally, and academically.

David was the only child in Foster Father's house, and he had bonded with Foster Father and Foster Father's family. David repeatedly expressed his desire to stay with Foster Father. Department witnesses believed it would be traumatic to remove David from Foster Father and that removal would reverse the progress he had made over the past few years. Although Dierdre expressed at trial that she wanted David to be placed with her, she had been inconsistent in this regard. She had previously stated to Department witnesses that she believed Foster Father was meeting David's needs. Foster Father believed that David should have a relationship with Logan, and he expressed his intention the facilitate the bond between the brothers.

We conclude that the evidence weighing against the finding that terminating Mother's parental rights was in David's best interest is not so significant that the trial court could not have reasonably formed a firm belief or conviction about the truth of the finding. *See* TEX. FAM. CODE § 161.001(b)(2). We hold that factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights was in David's best interest.

We overrule Mother's fifth issue.

### Appointment of Mother as Possessory Conservator

In her sixth issue, Mother argues that the trial court abused its discretion by failing to appoint her as David's possessory conservator.

Conservatorship decisions are subject to review for abuse of discretion, and we may reverse such determinations only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d at 856.

The Family Code includes statutory presumptions concerning appointment of a parent as a managing or possessory conservator. For example, section 153.131(a) contains a presumption that, subject to certain prohibitions, a parent shall be appointed sole managing conservator of the child unless the court finds that appointment of the parent as managing conservator would not be in the child's best interest because the appointment would significantly impair the child's physical

43

health or emotional development. TEX. FAM. CODE § 153.131(a). A parent that is not appointed as sole managing conservator shall be appointed as possessory conservator unless the court finds that the appointment is not in the best interest of the child and parental possession or access would endanger the physical or emotional welfare of the child. *Id.* § 153.191.

An order terminating the parent-child relationship divests a parent of all legal rights and duties with respect to the child. *Id.* § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. Because we have overruled Mother's challenges to the order terminating her parental rights to David, and thus Mother's legal rights and duties with respect to David have been divested, we cannot conclude that the trial court abused its discretion by not appointing Mother as David's possessory conservator. *See In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at *28 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet. h.) (mem. op.); *see also In re J.D.G.*, 570 S.W.3d at 856 (concluding that because court had upheld termination of mother's parental rights, mother lacked standing to challenge portion of termination order naming DFPS as managing conservator); *In re K.P.M.*, No. 01-17-00327-CV, 2017 WL 5353244, at *9 (Tex. App.—Houston [1st Dist.] Nov. 10, 2017, pet. denied) (mem. op.) (concluding that because sufficient evidence supported termination of mother's parental rights, she was disqualified as conservator for her children).

We overrule Mother's sixth issue.

## Conclusion

We affirm the trial court's judgment terminating Mother's parental rights to David.

April L. Farris
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.